**JEFFERY L. EDWARDS**                                                                 **PLAINTIFF**

**v.**                                        **Case No. 4:16-cv-00002-KGB**

**MONTY WHATLEY and UNION**
**PACIFIC RAILROAD**                                                              **DEFENDANTS**

## OPINION AND ORDER

Before the Court is defendants Monty Whatley and Union Pacific Railroad's ("Union Pacific") motion for summary judgment (Dkt. No. 33). In response, plaintiff Jeffery L. Edwards filed a motion to certify and response to motion for summary judgment (Dkt. No. 59). Defendants replied (Dkt. No. 62). The Court invited the parties to brief certain issues raised by the Court related to Mr. Edwards' claims and the pending motion for summary judgment (Dkt. No. 63). In response to that Order, and while the motion for summary judgment was pending, Mr. Edwards filed motions for leave to file an amended complaint (Dkt. Nos. 64, 66). For the following reasons, the Court denies Mr. Edwards' motions for leave to file an amended complaint (Dkt. Nos. 64, 66). The Court determines that the Railway Labor Act, 45 U.S.C. § 151 *et seq.* ("RLA"), preempts and precludes Mr. Edwards' claims and, therefore, dismisses with prejudice Mr. Edwards' complaint. The Court denies as moot defendants' motion for summary judgment and denies as moot Mr. Edwards' motion to certify (Dkt. Nos. 33, 59). Even if this Court were to consider Mr. Edwards' claims, the Court would deny his motion to certify, would not permit him to relitigate issues already decided by the National Railroad Adjustment Board (the "NRAB"), and therefore, would grant defendants' motion for summary judgment.

# I.    Procedural Background

Mr. Edwards originally filed this case in the Circuit Court of Jefferson County, Arkansas, against defendants Mr. Whatley and Union Pacific alleging race discrimination and retaliation under Title VII of the Civil Rights Act of 1963 ("Title VII"), 42 U.S.C. § 2000e *et seq*.; 42 U.S.C. § 1981; and the Arkansas Civil Rights Act of 1993 ("ACRA"), Ark. Code Ann. § 16-123-101 *et seq*. (Dkt. No. 1). When this action was originally filed, Mr. Edwards was the only named plaintiff. Defendants removed the case on the basis of federal question jurisdiction. *See Edwards v. Whatley, et al.*, Case No. 4:12-cv-00747-DPM (E.D. Ark. Nov. 29, 2012). The Court dismissed Mr. Edwards' federal claims in the original action and remanded the case to state court.

On March 31, 2014, Mr. Edwards filed an amended complaint in the Circuit Court of Jefferson County, Arkansas, against Mr. Whatley and Union Pacific alleging race discrimination and retaliation in violation of the ACRA (Dkt. No. 3, ¶¶ 15, 19). The amended complaint also added claims for a second plaintiff, Anthony Stokes (*Id.*, ¶ 1). On December 28, 2015, Mr. Edwards and Mr. Stokes filed a second amended complaint that alleged ACRA claims on behalf of Mr. Edwards and Mr. Stokes and added claims under 42 U.S.C. § 1981 on behalf of Mr. Edwards and Mr. Stokes (Count 1), a retaliation claim under the ACRA on behalf of Mr. Stokes in addition to the retaliation claim under the ACRA already alleged by Mr. Edwards (Count 2), and a claim under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, *et seq.*, on behalf of Mr. Edwards (Count 3) (Dkt. No. 16, ¶¶ 15, 21-28). With the addition of these federal claims, defendants removed the case based upon federal question jurisdiction (Dkt. No. 1).

On September 29, 2016, the Court granted defendants' motion to sever and ordered Mr. Stokes severed from this action pursuant to Federal Rule of Civil Procedure 21 (Dkt. No. 20). Mr. Edwards later filed a motion to dismiss and remand (Dkt. No. 29). Before the Court ruled on that

pending motion to dismiss and remand, Mr. Whatley and Union Pacific filed a motion for summary judgment, addressing Mr. Edwards' federal and state law claims (Dkt. No. 33). The Court granted, in part, and denied, in part, Mr. Edwards' motion to dismiss and remand: the Court dismissed with prejudice Mr. Edwards' federal law claims under 42 U.S.C. § 1981 and the FMLA at Mr. Edwards' request, but the Court retained supplemental jurisdiction over Mr. Edwards' remaining state law claims (Dkt. No. 41). Accordingly, at this time, the only remaining claims pending before the Court are Mr. Edwards' race discrimination and retaliation claims under the ACRA against Mr. Whatley and Union Pacific.

After reviewing the summary judgment filings, the Court invited the parties to brief the issue of whether the Court has jurisdiction to hear Mr. Edwards' remaining ACRA claims (Dkt. No. 63). Mr. Edwards filed a motion and brief arguing that the Court has jurisdiction, and the defendants responded in opposition (Dkt. Nos. 64, 67). Mr. Edwards also filed two motions for leave to file an amended complaint (Dkt. Nos. 64, 66). Defendants oppose those motions (Dkt. No. 68).

## II.    Factual Background

Defendants filed a statement of undisputed facts (Dkt. No. 35). Mr. Edwards filed a signed response to defendants' statement of undisputed facts (Dkt. No. 60). The following facts are taken from defendants' statement of undisputed facts, unless otherwise noted.

Mr. Edwards began working at Union Pacific as a brakeman/switchman in June 2002, and he was an engineer from September 2005 until his discharge in August 2011 (Dkt. No. 60, ¶ 1). Mr. Edwards took multiple leaves of absence for various reasons, and Mr. Whatley, the Superintendent, never denied Mr. Edwards' requests for a medical leave of absence or an extension of a leave (*Id.*, ¶ 2). Defendants argue that Mr. Edwards knew that, when he needed to take leave,

his first step was to contact his manager and inform the manager that leave was needed. Then he would complete paperwork to be put on an approved leave of absence, which protected his job seniority (*Id*., ¶ 3). Mr. Edwards denies that he ever had to contact his immediate manager when he sought leave; rather, he asserts that he went to "Health and Medical" whenever he needed a leave of absence (*Id.*).

Mr. Edwards took four months of leave between May and September 2004, two months of leave between December 2005 and February 2006, and six months of leave between July 2006 and January 2007 to care for his father (*Id.*, ¶ 4). Mr. Edwards took another year off of work from September 2009 until September 2010 due to purported mental health issues after a dispute on the telephone with a crew dispatch caller from Union Pacific's Crew Management Services ("CMS") (*Id*., ¶ 5). Mr. Edwards' temporary productive work assignment expired on September 22, 2010, at which point Mr. Edwards went back on a leave of absence for three more months, until December 2010, when he returned to full active duty at Union Pacific (*Id*., ¶ 6). Mr. Edwards filed a "Discrimination Claim" complaining about the fact that he was removed from "light duty" in September 2010, though this claim is not alleged in the operative complaint and therefore is not before this Court (Dkt. No. 33-1, at 71).

Later, due to a purported off-duty injury to his heel, Mr. Edwards began "laying off sick" on May 31, 2011, on Union Pacific's online system that tracks employee availability for work and dispatch (Dkt. No. 60, ¶ 7). Mr. Edwards testified that his status between May 31, 2011, to June 15, 2011, was "laying off sick." (Dkt. No. 33-1, at 22). Mr. Edwards further testified that, while he was laid off sick between May 31 and June 15, 2011, he continued to get calls from CMS to come to work (*Id*., at 22). Mr. Edwards also stated that he gave a copy of his MRI appointment to manager Bob Tannehill (Dkt. Nos. 33-1, at 22; 60, ¶ 8).

Mr. Edwards asserts that, on June 12, 2011, he told Mr. Tannehill that CMS kept calling him and that Mr. Tannehill needed to change Mr. Edwards' status (Dkt. Nos. 33-1, at 22, 60, ¶ 8). According to Mr. Edwards, Mr. Tannehill said that he would take care of it and, if CMS called Mr. Edwards again, that Mr. Edwards should just let a manager know (Dkt. No. 60, ¶ 8). Mr. Edwards contends that Mr. Tannehill "knew [Mr.] Edwards was having to have an MRI and that surgery was likely." (*Id.*, ¶ 9)

At Mr. Edwards' June 15, 2011, appointment, his doctor scheduled a tendon repair surgery for June 22, 2011 (Dkt. No. 33-1, at 23). Mr. Edwards testified that he spoke to Bob Tannehill on June 15, 2011, and told him that he would need to change his status to medical leave of absence (*Id.*, at 24). On June 23, 2011, the day after his surgery, CMS called Mr. Edwards to come to work (Dkt. Nos. 33-1, at 24; 60, ¶ 8). Mr. Edwards told them that he could not do so (Dkt. No. 33-1, at 24). Mr. Edwards hung up on CMS' computerized calls and was eventually connected with a live individual (*Id.*). Mr. Edwards testified that he told that individual that he had surgery the day before and would "be down for at least a couple of months." (*Id.*, at 25). According to Mr. Edwards, the CMS representative said he would put Mr. Edwards "down for a 72-hour leave." (*Id.*). Mr. Edwards responded that "it looks like I'm going to have to have a medical leave of absence." (*Id.*). Mr. Edwards testified that the "next day or a couple of days later, CMS called me again to come to work." (*Id.*). According to Mr. Edwards, he said or thought: "And here we go again. Y'all [CMS] just called me the other day, and I told you I'm in a cast and on crutches." (*Id.*). In response, according to Mr. Edwards, CMS told Mr. Edwards that "you're going to have to apply for a medical leave of absence." (*Id.*).

Mr. Edwards testified that, on July 1 or July 2, 2011, he then called the manager's office in Pine Bluff, Little Rock, and Omaha (*Id.*). He admits that, at this time, CMS was still calling

him to come into work (*Id.*). Mr. Edwards testified that, on July 1 or July 2, 2011, he contacted a CMS Manager and told him that he had spoken with his manager in Little Rock and had been told that "they were gonna put me in medical leave of absence status to keep you all from calling me." (*Id.*). Mr. Edwards also testified that he told the CMS manager that "I assume they hadn't done it." (*Id.*). According to Mr. Edwards, the CMS manager said, "Okay, Mr. Edwards, it looks like we have to do it." (*Id.*, at 26). According to CMS' records, Mr. Edwards was in "LS" status from July 2 to August 2, 2011 (*Id.*, at 74). Mr. Edwards testified that he knew how to check his status on the computer but that he did not because he assumed that he had spoken with an individual who would change his status to medical leave of absence (*Id.*, at 34).

Mr. Edwards also testified that, around July 1, 2011, he attempted to call manager Joe Murphy, and Mr. Murphy called him back (*Id.*, at 30). Mr. Edwards testified that he "informed [Mr. Murphy] that CMS keeps calling me to come to work and what do I need to do." (*Id.*). Mr. Edwards testified that he could not remember what Mr. Murphy said to him during this conversation (*Id.*). Mr. Edwards' phone call with Mr. Murphy is not included in the self-authored timeline of events provided by Mr. Edwards (*Id.*, at 73).

Mr. Edwards presents an affidavit attached to his response to defendants' motion for summary judgment which says that "I contacted Joe Murphy . . . and discussed my need for leave and the fact that I was on crutches." (Dkt. No. 59, at 47). In that same affidavit, Mr. Edwards avers that he "called Mr. Whatley's office, 501-373-2110, twice on 7/26/11, as proven by my phone bills attached as Exhibit 1. I made these contacts, so I would not be absent for more than 30 days." (*Id.*).

Mr. Edwards further testified that, on July 15, 2011, he called Terry Owens, the "Return to Work Manager," and told her that he had surgery, that he would be in the cast at least until his next

doctor's appointment, but that he might then be put in a boot and would need to get situated for

light duty at that time (*Id.*; Dkt. No. 60, ¶ 12; Dkt. No. 33-1, at 26). Mr. Edwards further testified

that Ms. Owens did not ask him to send her any medical records or other information at that time

(Dkt. No. 33-1, at 26). Mr. Edwards also asserted that he told Ms. Owens that his next doctor's

appointment was set for July 25, 2011 (*Id.*, at 27). Mr. Edwards' doctor's appointment was

postponed until July 26, 2011 (*Id.*). Mr. Edwards testified that, that same day, he called Ms. Owens

and asked her what medical records she needed (*Id.*). Mr. Edwards further testified that he put

Ms. Owens on the phone with the doctor's receptionist, at which point they had a 10-minute

conversation (*Id.*). The receptionist then made copies of the needed records and provided them to

Mr. Edwards (*Id.*). Mr. Edwards told Ms. Owens that he would provide the records to her, and she

replied, "I'll start working on you from this end." (*Id.*). Mr. Edwards admits that Ms. Owens is

not an operations manager or one of Mr. Edwards' supervisors (Dkt. No. 60, ¶ 13). Ms. Owens

testified that she spoke to Mr. Edwards' managers, but she could not confirm whether those

conversations occurred before August 2, 2011 (Dkt. No. 33-3, at 3).

On July 26, 2011, Ms. Owens made the following notation in Union Pacific's system:

> EE began calling me on 7/18 or so not leaving any information other than to call
> him. I returned his call on 7/19 and received his VM. I got a call from him on 7/21
> and when I returned his call I got his VM. I left [a] message for him to leave details
> for me since I do not seem to be able to reach him. H left VM for me on 7/25 that
> said he had surgery on 7/22 and wanted to look into TPW. I called and left VM on
> 7/26 relating that I would need medical documentation to review, told him my
> availability for the day and would set him up in TPW as appropriate. Looking at
> his work history, ee hasn't worked since 5/31. He has LS mostly but from 6/23-
> 6/30 he was in FL IE. Not sure he certified this FL.

(Dkt. No. 33-2, at 1). Ms. Owens received Mr. Edwards' medical record paperwork on August 4,

2011 (Dkt. No. 60 ¶ 14). On August 4, 2011, Ms. Owens made an additional notation in Union

Pacific's system:

I received medical from the EE on 8/3 and I sent the notes to OHN for TPW. Last ee and I talked I had requested medical on 7/26. As I sent the medical I learned ee went into AWOL status on 8/2. I talked to him today after searching for any medical faxed to me from him between 7/26-8/2. I saw no medical received. I was going to request MLOA until his next MD visit and backdate the MLOA to first date of this treatment on 6/2/11. He said he had faxed the medical on 7/26 from the MD office (which is the date of the light duty release) . . . . I have explained that although medical is sent and received by a health and medical person such as RTWM or OHN, it does not necessarily protect seniority unless the medical was timely and able to be handled by appropriate medical staff to allow MLOA or FMLA. I suggested that he must always keep his manager updated. His MOP is Bruce Landrum. I suggested he talk with his MOP and if he needs verification that I had talked with ee on 7/26 and that I had received medical on 8/2 I would verify. However, I told him I could not send his medical documentation to his manager. He will contact his manager. I also told him the dates in question [were] 7/2-8/2 the 30 days he seemingly did not "protect" with operations. He does have documentation that he was seen by MD on 7/26 which is within this time frame. I cannot help any further until he gets his AWOL status cleared.

(Dkt. No. 33-2, at 1).

In a letter dated August 2, 2011, sent by Mr. Whatley to Mr. Edwards, Mr. Whatley informed Mr. Edwards that "[o]ur records indicate that you have not performed service since July 1, 2011, therefore, you are absent without leave." (Dkt. No. 33-1, at 64). Mr. Whatley testified that Mr. Edwards was fired because "[h]e was AWOL, absent without leave, for a period equal to or greater than 30 days." (Dkt. No. 33-4, at 3). He further testified that, to keep from being fired, Mr. Edwards needed to "[w]ork within that 30-day period or have some sort of approved leave." (*Id.*). Mr. Whatley testified that he receives data on employee absences, on a weekly basis, from CMS (*Id.*, at 4-5). Mr. Whatley further testified that the "30-day AWOL" policy is spelled out in the collective bargaining agreement (*Id.*, at 6-7). Mr. Whatley recalled that he was told that Mr. Edwards "had not spoken to his manager during that 30-day [period] . . . ." (*Id.*, at 8). Mr. Whatley further testified that the collective bargaining agreement requires communication with a supervisor or manager and that communication with Ms. Owens would not qualify if an employee was trying to let Union Pacific know that he or she would be absent (*Id.*, at 11-12).

Mr. Whatley testified that Mr. Murphy "could be" an appropriate manager for an employee to contact if that employee wished to be put on approved leave (*Id*., at 12). Mr. Murphy was a transportation manager, so he was an appropriate person with whom to speak, according to Mr. Whatley (*Id.*, at 13-14). Mr. Whatley also testified that Ms. Owens did not know that Mr. Whatley decided to terminate Mr. Edwards (*Id*.). Further, according to Mr. Whatley, Mr. Murphy did not speak to Mr. Whatley about Mr. Edwards, although Mr. Whatley conceded that, if Mr. Murphy had spoken to Mr. Edwards, Mr. Murphy should have told Mr. Whatley that he had spoken to Mr. Edwards (*Id*., at 13-14). Finally, Mr. Whatley testified that Mr. Murphy "probably" knew that he was considering terminating Mr. Edwards (*Id*., at 14). Mr. Whatley concluded, however, that neither Ms. Owens nor Mr. Murphy told him that they had been in contact with Mr. Edwards (*Id*., at 12-13).

On Mr. Edwards' behalf, his union, the Brotherhood of Locomotive Engineers and Trainmen, challenged Union Pacific's decision to terminate Mr. Edwards (Dkt. No. 33-5). On August 1, 2014, the NRAB ruled against Mr. Edwards, finding that Mr. Edwards' union failed to prove that Union Pacific violated the collective bargaining agreement when it terminated Mr. Edwards for being absent without leave for more than 30 consecutive days (*Id*., at 2).

In 2010, a fellow employee informed Mr. Edwards that another employee drove a truck with a rebel flag on it (Dkt. No. 33-1, at 35). In February 2011, Mr. Edwards saw the vehicle (*Id*., at 36). Mr. Edwards called manager "Hatley" and reported the vehicle (*Id*., at 36-37). In response, Mr. Hatley said, "I was having a good day until you brought me some bullshit like this." (*Id*., at 37). In May 2011, Mr. Edwards saw the same truck with the same flag in the parking lot (*Id*., at 38). He took a picture of the truck with the flag and sent it to Yvonne Method-Walker, the director of diversity (*Id*., at 39, 69). He also sent the picture to William Turner and Mike Smith, the

president of the Black Employee Network (*Id.*, at 39-40). Mr. Edwards sent each of these individuals a "certified letter[] and a copy of the conversation that depicted what had happened back in February." (*Id.*, at 40). A copy of this letter is included in the record (*Id.* at 68). A few weeks later, Mr. Edwards received a call from Amy Bang, a member of the "EEO department," and he told her what had happened (*Id.*, at 39-40). Later, Mr. Edwards received a letter dated June 30, 2011, from Ms. Bang which said that Union Pacific had identified the employee who owned the vehicle in question and that the employee who owned the truck had been counseled (*Id.*, at 40, 70).

In relation to his termination and this complaint about the rebel flag, in his affidavit, Mr. Edwards states: "I did the very same thing with my other leaves . . . . Contact with CMS or the RTW manager like Ms. Owens was always good enough for UPRR before I complained. Mr. Whatley had never denied me a leave before I complained, and my managers had always relayed the messages to the supervisor. After I complained, that changed. It became difficult to get managers on the phone. The only thing that changed between the previous leaves and the last leave was that I had complained about the Confederate Flag." (Dkt. No. 59, at 47).

Mr. Edwards also testified about other incidents he observed or heard about as an employee at Union Pacific (Dkt. No. 33-1, at 42). Mr. Edwards testified that the Caucasian son of a 40-year veteran was hired and that the son got into a fight with an African American employee (*Id.*, at 43). Mr. Edwards further testified that "they went and changed the rules to fighting and started sending everyone to anger management, because they could not fire the black employee without firing the white one." (*Id.*). Mr. Edwards also stated that a Caucasian employee was not fired even though the Caucasian employee said that "you all know that I have switch keys to the main line, and I will go out there on the main line and line the switches against oncoming trains." (*Id.*, at 43-44).

Furthermore, Mr. Edwards stated that a Caucasian employee was not fired even though he mistakenly directed a "black crew to pick up . . . certain cars in a certain rail and take them to Memphis." (*Id*., at 44). Finally, Mr. Edwards related that Union Pacific chose a Caucasian employee over an African American employee for a safety position, even though the Caucasian employee was suspended for a "major safety infraction." (*Id*., at 47).

### III.    Motion To Amend

After the Court invited the parties to file supplemental briefings on the issue of whether the Court has jurisdiction to consider Mr. Edwards' remaining claims, Mr. Edwards filed motions for leave to amend his complaint (Dkt. No. 64, 66). As the motions are identical, but a copy of the proposed third amended complaint is attached to the later-filed motion, the Court will consider the later-filed motion (Dkt. No. 66). The Court denies as moot Mr. Edwards' first motion for leave to amend and, for the following reasons, denies the later-filed motion as well (Dkt. Nos. 64, 66).

In his motion, Mr. Edwards asks the Court to allow him to file a third amended complaint to add claims under 42 U.S.C. § 1981 (*Id*.). In his motion, Mr. Edwards makes the statement "[h]ad this question been raised earlier, Plaintiff would have sought to add claims under 42 U.S.C. [§] 1981 . . . ." (Dkt. No. 66, at 1). Asserting federal claims alone will not overcome the jurisdictional issue the Court asked the parties to address. Regardless of whether plaintiff's claims arise under federal or state law, this Court is required to examine the impact of the RLA in this litigation. "The Railway Labor Act provides that all minor disputes must be resolved in mandatory arbitration before the Railway Labor Board and that federal and state courts lack jurisdiction over such claims." *Deneen v. Nw. Airlines, Inc.*, 132 F.3d 431, 439 (8th Cir. 1998) (citing 45 U.S.C. § 151a (1994)); *see Thompson v. Air Transport Intern. Ltd. Liability Co.*, 664 F.3d 723, 725-26 (8th Cir. 2011) (same).

With respect to the claims Mr. Edwards now seeks to add through his proposed third amended complaint, he asserted claims for discrimination and retaliation under 42 U.S.C. § 1981, and those claims were dismissed without prejudice at his request once in the initial litigation. *See Edwards v. Whatley, et al.*, Case No. 4:12-cv-00747-DPM, Dkt. Nos. 1, 9 (E.D. Ark. Nov. 29, 2012). In this litigation, when he first filed his complaint, Mr. Edwards alleged claims for discrimination and retaliation under § 1981, among other claims (Dkt. No. 2). Then, in his first amended complaint, Mr. Edwards alleged only ACRA claims, abandoning his § 1981 claims (Dkt. No. 3). In his second amended complaint filed on January 4, 2016, Mr. Edwards alleged only a discrimination claim under § 1981 and a retaliation claim only under the ACRA (Dkt. No. 16, at 2-3). At Mr. Edwards' request, the Court dismissed with prejudice his then-pending federal claims in this litigation (Dkt. No. 41, at 4).

Mr. Edwards' current proposed third amended complaint alleges that "[d]efendants have discriminated against the Plaintiff on the basis of his race in violation of the Arkansas Civil Rights Act of 1993 and 42 U.S.C. [§] 1981." (Dkt. No. 66-1, ¶ 15). It also alleges that "[d]efendants have retaliated against the Plaintiff Edwards in violation of the ACRA and 42 U[.]S[.]C[.] § 1981." (*Id.*, ¶ 19). The Court denies Mr. Edwards leave to amend his complaint a third time to add a claim for racial discrimination pursuant to § 1981 since the Court has already dismissed with prejudice at his request an identical claim (Dkt. No. 41).

In regard to his retaliation claim under § 1981, Mr. Edwards was terminated in or about August 2011. His retaliation claim under § 1981 is subject to a four-year statute of limitations. *Jackson v. Homechoice, Inc.*, 368 F.3d 997, 999 (8th Cir. 2004) (determining that a four-year statute of limitations applies to retaliation claims under 42 U.S.C. § 1981). For his proposed § 1981 retaliation claim to be timely, Mr. Edwards must argue that it relates back to his initial

complaint under Federal Rule of Civil Procedure 15(c).  Whether an amended pleading should be allowed and whether it relates back to the date of the original pleading are matters within the sound discretion of the trial court.  *Shea v. Esensten*, 208 F.3d 712, 720 (8th Cir. 2000).  Generally, where the legal theory changes, but the incident or occurrence which is the basis of the lawsuit does not, relation back is allowed.  The well-pleaded facts of the complaint, not the legal theories or legal conclusions, are what determine if Rule 15 is satisfied.  *Maegdlin v. Int'l Ass'n of Machinists & Aerospace Workers, Dist. 949*, 309 F.3d 1051, 1053 (8th Cir. 2002).

Despite this, Mr. Edwards makes no effort to demonstrate good cause for the Court to allow such an amendment as the deadline to seek leave to amend pleadings expired on April 17, 2017 (Dkt. No. 17, at 1).  *See* Fed. R. Civ. P. 16(b)(4) ("A schedule may be modified only for good cause and with the judge's consent.").

Further, as explained in this Order, permitting Mr. Edwards to file the proposed third amended complaint would be futile.  *Geier v. Missouri Ethics Comm'n*, 715 F.3d 674, 678 (8th Cir. 2013) (explaining that a proposed amendment may be denied as futile if the proposed amended claim could not withstand a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6)).  If the RLA preempts Mr. Edwards' ACRA claims, it precludes the similar claims he intends to assert under § 1981.

Even if Mr. Edwards' claims are not preempted and precluded, the Court will not permit him to relitigate in this action issues already decided by the NRAB.  As a result, even if the RLA does not preempt and preclude Mr. Edwards' claims, defendants are entitled to summary judgment on those claims.  Accordingly, for these reasons, Mr. Edwards' motions for leave to file an amended complaint are denied (Dkt. Nos. 64, 66).

## IV.    Preemption And Preclusion

Due to the undisputed collective bargaining agreement and the matter decided by the NRAB, the Court reexamines the basis of its jurisdiction over Mr. Edwards' ACRA discrimination and retaliation claims.  The Court determined in a prior Order that it would retain jurisdiction over those claims (Dkt. No. 41).  Based upon the Court's reexamination of its jurisdiction, the Court concludes that Mr. Edwards' remaining claims of racial discrimination against Union Pacific and for retaliation against Mr. Whatley and Union Pacific are completely preempted and precluded by the RLA.  Accordingly, the Court must dismiss the claims as the RLA's mandatory arbitration requirement provides the exclusive remedy for "minor disputes."

As a general rule a plaintiff can avoid removal to federal court by alleging only state law claims.  *Caterpillar Inc. v. Williams*, 482 U.S. 386, 392 (1987).  The "well-pleaded complaint rule" requires that a federal cause of action must be stated on the face of the complaint before the defendant may remove the action based on federal question jurisdiction.  *Gaming Corp. of Am. v. Dorsey & Whitney*, 88 F.3d 536, 542 (8th Cir. 1996).  A federal defense, including the defense that one or more claims are preempted by federal law, does not give the defendant the right to remove to federal court.  *Caterpillar*, 482 U.S. at 392-93.  Complete preemption provides an exception to the well-pleaded complaint rule and is different from preemption used only as a defense.  *Gaming Corp.*, 88 F.3d at 543.  When "Congress so completely pre-empt[s] a particular area," its preemption may convert a state law claim into a federal claim for purposes of the well-pleaded complaint rule.  *Metro. Life Ins. Co. v. Taylor*, 481 U.S. 58, 63 (1987).

The Court questions whether the RLA dictates complete federal preemption in this case. In *Gore v. Trans World Airlines*, the Eighth Circuit held that the RLA, in certain circumstances, completely preempts state-law claims.  210 F.3d 944, 949 (8th Cir. 2000).  "Congress' purpose in

passing the RLA was to promote stability in labor-management relations by providing a comprehensive framework for resolving labor disputes." *Id.* "Under the RLA, parties are obligated to arbitrate minor disputes, which are controversies arising out of the application or interpretation of the collective bargaining agreement." *Id.* (citing *Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246, 256-59 (1994)). Claims of preemption under the RLA are governed by a standard that determines "a cause of action is not pre-empted by the RLA if it involves rights and obligations that exist independent of the [collective bargaining agreement]." *Gore*, 210 F.3d at 949 (quoting *Hawaiian Airlines, Inc.*, 512 U.S. at 260). Where the resolution of the claim "depends on an interpretation of the [collective bargaining agreement], the claim is pre-empted." *Id.* (quoting *Hawaiian Airlines, Inc.*, 512 U.S. at 261). There is a rebuttable presumption that disputes between a railroad and its union employees are minor and, therefore, arbitrable under the RLA. *See Schiltz v. Burlington N. R.R.*, 115 F.3d 1407, 1414 (8th Cir. 1997).

The Court notes that, if the claim is a "minor dispute" and is therefore completely preempted by the RLA, the proper remedy is dismissal of the claim. *Hawaiian Airlines, Inc.*, 512 U.S. at 256; *see* 45 U.S.C. § 184. An adjustment board has "mandatory, exclusive, and comprehensive" jurisdiction over minor disputes, and the remedies it provides are the "complete and final means for settling the minor disputes." *Bhd. of Locomotive Eng'rs v. Louisville & Nashville R.R. Co.*, 373 U.S. 33, 38-39 (1963); *see Hastings v. Wilson*, Civ. No. 05-2566 (RHK/AJB), 2007 WL 333617, at *4 (D. Minn. Feb. 1, 2007) (dismissing action because the claim was preempted by the RLA); *Jenisio v. Ozark Airlines, Inc. Retirement Plan for Agent and Clerical Employees*, 187 F.3d 970, 973 (8th Cir. 1999) (quoting *Bhd. of Locomotive Eng'rs*, 373 U.S. at 39).

Here, all parties agree that, on Mr. Edwards' behalf, his union, the Brotherhood of Locomotive Engineers and Trainmen, challenged Union Pacific's decision to terminate Mr. Edwards (Dkt. No. 33-5). On August 1, 2014, the NRAB ruled against Mr. Edwards, finding that Mr. Edwards' union failed to prove that Union Pacific violated the collective bargaining agreement when it terminated Mr. Edwards for being absent without leave for more than 30 consecutive days (*Id.*, at 2).

When examining preemption based on the RLA, the Eighth Circuit Court of Appeals has determined:

> [P]urely factual questions about an employee's conduct or an employer's conduct and motives do not requir[e] a court to interpret any term of a collective bargaining agreement . . . . Also a mere need to reference or consult a collective bargaining agreement during the course of state court litigation does not require preemption . . . . Our preemption analysis focuses on a determination of whether the state-law claim confers nonnegotiable state-law rights on employers or employees independent of any right established by contract, or, instead, whether evaluation of the tort claim is inextricably intertwined with consideration of the terms of the labor contract.

*Gore*, 210 F.3d at 949 (internal quotations and citations omitted).

In *Colorado Anti-Discrimination Commission v. Continental Air Lines, Inc.*, 372 U.S. 714 (1963), the Supreme Court determined that a state law racial discrimination claim was not barred by the RLA. The Court determined that the state action was not preempted by the RLA because it was sufficiently independent of the RLA grievance mechanism, the activity regulated involved legitimate state interests, and an analysis of the collective bargaining agreement was not required. 372 U.S. at 724. In *Gore*, when examining this issue, the Eighth Circuit affirmed the district court's determination that the plaintiff's state-law claims were preempted because they were inextricably intertwined with a consideration or interpretation of the collective bargaining agreement. 210 F.3d at 950. The plaintiff in *Gore* claimed false arrest, negligence, libel and

slander, and invasion of privacy under Missouri state law. *Id*. at 949. To prevail on his claims, plaintiff had to prove certain facts regarding defendants' conduct with respect to each claim. *Id*. at 950 (that defendants' actions were "without legal justification" for the false arrest claim), at 950 (that defendants' publication of statements was with the requisite degree of fault for libel and slander claims), at 951 (that defendants breached a duty in investigating a claim of a threat for negligence claim), at 951 (that defendants' actions were unreasonable in obtaining and disclosing private information or that disclosure would be highly offensive to a reasonable person for false light claim). Relying on the relative rights and duties contained within the parties' collective bargaining agreement, to defend against each claim, defendants maintained that their actions were required according to their interpretation of specific provisions in the collective bargaining agreement. *Id*. at 950-51. The *Gore* court concluded that plaintiff's claims were rooted in an interpretation of the collective bargaining agreement, that plaintiff could not succeed on his claim without interpreting certain terms of the collective bargaining agreement, and that plaintiff had in effect artfully pleaded his claims to avoid preemption. *Id*. at 951. Because plaintiff could not "establish liability on his tort claims without demonstrating that defendants' actions were wrongful under a proper interpretation of the relevant rights and duties bargained for in the collective bargaining agreement," the *Gore* court affirmed the district court's decision and considered plaintiff's claims preempted. *Id*. at 952.

Likewise, in *Boldt v. Northern States Power Company*, 904 F.3d 586 (8th Cir. 2018), the Eighth Circuit affirmed the district court's decision that plaintiff's claim alleging disability discrimination under the Minnesota Human Rights Act ("MHRA") based on perceived disability was preempted by the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185. To analyze preemption under the RLA and LMRA, courts apply the same analysis. *See Gore*, 210 F.3d at 949

("[c]laims of preemption under the RLA are governed by a standard that is 'virtually identical' to that employed" under § 301 of the LMRA). To analyze the MHRA disability discrimination claim, the court applied the "familiar three-step McDonnell Douglas framework . . . ." *Boldt*, 904 F.3d at 591. The Eighth Circuit determined the parties' collective bargaining agreement incorporated the employer's fitness-for-duty policy. *Id*. at 592. Then, the court determined that, to establish his claim under the framework set forth in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973), plaintiff had to prove that he was "qualified" to continue working. *Id*. The *Boldt* court reasoned that plaintiff could not "prevail on his disability-discrimination claim without proving that he was qualified to work 'under a proper interpretation of the relevant rights and duties' incorporated into the collective-bargaining agreement" and that defendant employer argued "the actions it took against Boldt, including placing conditions on his reinstatement, 'were required according to' its interpretation of the collective-bargaining agreement and its fitness-for-duty policy." *Id*. at 593 (citing *Gore*, 210 F.3d at 950, 952). As a result, the *Boldt* court concluded that, because the plaintiff's "claim [wa]s 'substantially dependent on analysis of [the] collective-bargaining agreement,'" his state law MHRA claim was preempted by § 3 of the LMRA. *Id*. (alteration in original) (quoting *Caterpillar, Inc.*, 482 U.S. at 394). The *Boldt* court specifically declined to reach the question of whether interpretation of the collective-bargaining agreement would be necessary at steps two and three of the *McDonnell Douglas* framework so as to trigger complete preemption because the court determined the district court would need to interpret the fitness-for-duty policy to determine whether the plaintiff established his *prima facie* case and because the outcome of the case would be the same regardless. *Id*. at 592 n.2.

Mr. Whatley and Union Pacific argued against remand to state court, but they did not assert preemption (Dkt. No. 30). Instead, the Court invited the parties to brief the issue of preemption.

In response, Mr. Edwards filed supplemental briefing in which he argues that his claims are not preempted by the RLA because his claims do not require the interpretation of a collective-bargaining agreement (Dkt. No. 65, at 5-9). In response, defendants argue that "Mr. Edwards' entire ACRA case is premised on his argument that he was not [absent without leave] in violation of the C[ollective] B[argaining] A[greement]." (Dkt. No. 66, at 2).

The RLA may preclude federal claims, as well. The analysis for determining whether federal claims are precluded is similar for determining whether state law claims are preempted. *See*, *e.g.*, *Pittari v. American Eagle Airlines, Inc.*, 468 F.3d 1056, 1060 (8th Cir. 2006) (examining whether plaintiff's claims under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, were precluded by the RLA); *Deneen*, 132 F.3d at 439 (examining whether plaintiff's claims under the federal Pregnancy Discrimination Act, 42 U.S.C. § 2000e(k), were precluded by the RLA); *Benson v. Nw. Airlines, Inc.*, 62 F.3d 1108, 1114 (8th Cir. 1995) (examining whether plaintiff's claim under the ADA was precluded by the RLA); *Bowe v. Nw. Airlines, Inc.*, 974 F.2d 101, 103 (8th Cir. 1992) (examining whether plaintiff's claim under the Employee Retirement Income Security Act, 29 U.S.C. §§ 1001 *et seq.*, was precluded by the RLA); *see also Carlson v. CSX Transp., Inc.*, 758 F.3d 819, 832-34 (7th Cir. 2014) (examining whether plaintiff's Title VII claim was precluded by the RLA).

Federal statutory claims may be precluded by the RLA "when the heart of the dispute between the parties is a disagreement over the interpretation of some part of a CBA . . . ." *Brown v. Illinois Cent. R.R. Co.*, 254 F.3d 654, 664 (7th Cir. 2001); *see Roslyn v. Nw. Airlines, Inc.*, No. 05-0441 (PAM/RLE), 2005 WL 1529937, at *2 (D. Minn. June 29, 2005) ("Thus, the Court is persuaded that . . . a federal claim is precluded by the RLA only if the claim depends on the interpretation of the CBA for its resolution."). The Court also notes that the elements of racial

discrimination and retaliation claims under § 1981 are the same as the elements of racial discrimination and retaliation claims under the ACRA. *See Schaffhauser v. United Parcel Service, Inc.*, 794 F.3d 899, 902 (8th Cir. 2015) (determining that the analysis for discrimination claims is the same under Title VII, § 1981, and the ACRA); *Robinson v. American Red Cross*, 753 F.3d 749, 756-57 (8th Cir. 2014) (analyzing under the same legal framework retaliation claims under Title VII and the ACRA); *Wright v. St. Vincent Health System*, 730 F.3d 732, 737 (8th Cir. 2013) (determining that the elements of retaliation claims under Title VII and § 1981 are the same); *Hill v. City of Pine Bluff, Ark.*, 696 F.3d 709, 715-16 (8th Cir. 2012) (analyzing ACRA retaliation claims under the same substantive standards as retaliation claims under Title VII); *Davis v. KARK-TV, Inc.*, 421 F.3d 699, 703 (8th Cir. 2005) (determining that the analysis for discrimination claims is the same under Title VII, § 1981, and the ACRA).

### A.       Race Discrimination Claim

The Court must determine whether, in evaluating Mr. Edwards' race discrimination claim against Union Pacific, it will be "'require[d]' to interpret 'some specific provision' of the collective bargaining agreement." *Boldt*, 904 F.3d at 591 (quoting *Meyer v. Schnucks Markets, Inc.*, 163 F.3d 1048, 1051 (1998)). To assess a claim for racial discrimination in the absence of direct evidence, the Court applies the burden-shifting analysis from *McDonnell Douglas*. *See Alexander v. Eastern Tank Services., Inc.*, 505 S.W.3d 239, 245 (Ark. Ct. App. 2016). Under this framework, the plaintiff bears the burden of establishing a *prima facie* case of racial discrimination. *Torgerson v. City of Rochester*, 643 F.3d 1031, 1046 (8th Cir. 2011) (en banc). To establish a *prima facie* case of racial discrimination, Mr. Edwards must show that: "(1) he is a member of a protected class, (2) he met his employer's legitimate expectations, (3) he suffered an adverse employment action, and (4) the circumstances give rise to an inference of discrimination (for example, similarly

situated employees outside the protected class were treated differently)." *Young v. Builders Steel Co.*, 754 F.3d 573, 577 (8th Cir. 2014) (quoting *Gibson v. Am. Greetings Corp.*, 670 F.3d 844, 853-54 (8th Cir. 2012)).

Defendants argue that Mr. Edwards' racial discrimination claim against Union Pacific fails because Mr. Edwards was not meeting the legitimate expectations of Union Pacific due to his absence without leave beginning on July 1, 2011, and because the record contains no evidence allowing an inference of racial discrimination (Dkt. No. 34, at 14). Mr. Edwards retorts that he has made a *prima facie* case by demonstrating that he "was black and was terminated" and by showing that he met Union Pacific's expectations by contacting Mr. Murphy during July 2011 (Dkt. No. 61, at 4).

The undisputed record evidence shows that Union Pacific, *via* its collective bargaining agreement, had a policy that workers could be terminated if they were absent without leave for a period equal to or greater than 30 days (Dkt. No. 33-4, at 3). The record evidence also shows that, to avoid being fired under this policy, Mr. Edwards needed to "[w]ork within that 30-day period or have some sort of approved leave." (*Id.*). Mr. Whatley testified that, to avoid being found absent without leave, Mr. Edwards should have spoken with a supervisor or manager and that Mr. Murphy qualified as such a manager (Dkt. No. 33-4, at 12). On August 2, 2011, Union Pacific sent Mr. Edwards a letter indicating that he was absent without leave because their "records indicate[d] that you have not performed service since July 1, 2011." (Dkt. No. 33-1, at 64). Mr. Edwards was fired because "[h]e was AWOL, absent without leave, for a period equal to or greater than 30 days." (Dkt. No. 33-4, at 3).

During his deposition, Mr. Edwards testified that he "informed [Mr. Murphy] that CMS keeps calling me to come to work and what do I need to do." (Dkt. No. 33-1, at 30). Mr. Edwards

further testified that he could not remember what Mr. Murphy said to him during this conversation (*Id.*). In his affidavit attached to his response to the motion for summary judgment, Mr. Edwards now contends that he spoke with Mr. Murphy and "discussed my need for leave and the fact that I was on crutches." (Dkt. No. 59, at 47). Furthermore, while the record evidence indicates that Mr. Edwards spoke to Ms. Owens in July 2011, the undisputed record evidence indicates that Ms. Owens was not an individual who Mr. Edwards could notify to avoid being found absent without leave (Dkt. No. 33-4, at 12-13). Additionally, while the record contains evidence that Mr. Edwards spoke to CMS during July 2011, there is no evidence in the record that CMS qualified as a supervisor or manager with whom Mr. Edwards could speak to avoid being found absent without leave (*Id.*).

Here, viewing the record evidence in the light most favorable to Mr. Edwards, the Court concludes that it must interpret the collective bargaining agreement to determine if Mr. Edwards was meeting his employer's legitimate job expectations. Thus, the Court concludes that Mr. Edwards' race discrimination claim "involve[s] the application of a valid agreement to a specific grievance" and therefore involves "minor" disputes under the RLA. *Evans v. Nw. Airlines, Inc.*, 29 F.3d 438, 440 (8th Cir. 1994) (quotation and citation omitted). Further, the Court finds that this case is similar to *Boldt*, where the Eighth Circuit reasoned that a plaintiff could not "prevail on his disability-discrimination claim without proving that he was qualified to work 'under a proper interpretation of the relevant rights and duties' incorporated into the collective-bargaining agreement" and that defendant employer argued "the actions it took against Boldt, including placing conditions on his reinstatement, 'were required according to' its interpretation of the collective-bargaining agreement and its fitness-for-duty policy." 904 F.3d at 593. In this case, Union Pacific's defense is that it was entitled to terminate Mr. Edwards' seniority because he was

absent without leave under the collective-bargaining agreement; Mr. Edwards argues that he met the legitimate expectations of his employer by taking actions that prevented him from being absent without leave under the collective-bargaining agreement.

The Court also concludes that this case is distinguishable from *Colorado Anti-Discrimination Commission*. There, the Supreme Court held that the RLA did not "bar States from protecting employees against racial discrimination," but the Supreme Court did not have to determine if a collective-bargaining agreement was implicated by the state-law cause of action. 372 U.S. at 724.

The Court concludes that, to determine whether Mr. Edwards can establish that he was meeting the legitimate expectations of his employer, the Court must find whether Mr. Edwards was "absent without leave" under the terms of the collective-bargaining agreement. This inquiry goes beyond "purely factual questions about an employee's conduct or an employer's conduct" and instead requires the Court to determine whether Mr. Edwards' contacts with Union Pacific were sufficient, *under the collective-bargaining agreement*, to prevent him from being absent without leave. *See Hawaiian Airlines, Inc.*, 512 U.S. at 261 (internal quotation marks omitted) (quoting *Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399, 407 (1988)). Just as in *Gore*, defendants argue that their termination of Mr. Edwards was allowed under the collective bargaining agreement. Thus, to show that he met the legitimate expectations of his employer—an element of the *prima facie* showing required by a racial discrimination claim under the ACRA and § 1981—Mr. Edwards must show that he was not absent without leave under a proper interpretation of the collective-bargaining agreement. The Court therefore finds that Mr. Edwards' *prima facie* showing for his racial discrimination claim against Union Pacific is substantially

dependent upon an analysis of the collective-bargaining agreement and is therefore completely preempted and precluded by the RLA.

Further, based on undisputed record evidence, on Mr. Edwards' behalf, his union, the Brotherhood of Locomotive Engineers and Trainmen, challenged Union Pacific's decision to terminate Mr. Edwards (Dkt. No. 33-5). On August 1, 2014, the NRAB ruled against Mr. Edwards, finding that Mr. Edwards' union failed to prove that Union Pacific violated the collective bargaining agreement when it terminated Mr. Edwards for being absent without leave for more than 30 consecutive days (*Id.*, at 2).

Viewing the record evidence in the light most favorable to Mr. Edwards, the Court concludes that Mr. Edwards' race discrimination claim against Union Pacific is subject to mandatory binding arbitration under the RLA. The Court dismisses with prejudice Mr. Edwards' race discrimination claims against Union Pacific.

### B. Retaliation Claims

The Court also concludes that Mr. Edwards' retaliation claims are preempted and precluded by the RLA. Mr. Edwards has alleged that Mr. Whatley and Union Pacific retaliated against him because he reported a vehicle with a rebel flag on it. Approximately one month after Mr. Edwards claims he reported the vehicle, Mr. Edwards was terminated for being absent without leave for 30 consecutive days (Dkt. No. 59, at 29). To establish a *prima facie* retaliation claim, Mr. Edwards must show that: (1) he engaged in protected conduct; (2) a reasonable employee would have found the retaliatory action materially adverse; and (3) the materially adverse action was causally linked to the protected conduct. *Brown v. City of Jacksonville*, 711 F.3d 883, 892 (8th Cir. 2013); *Pye v. Nu Aire, Inc.*, 641 F.3d 1011, 1021 (8th Cir. 2011). Once the *prima facie* case is established, the familiar burden shifting analysis applies. Mr. Whatley and Union Pacific must offer a legitimate,

nonretaliatory reason for its actions. If they do so, then Mr. Edwards must prove that the proffered reason is pretextual and that retaliation was the reason for the action. *See Ellis v. Houston*, 742 F.3d 307 (8th Cir. 2014) (determining that § 1981 retaliation claims are analyzed under the same *McDonnell Dougla*s burden shifting framework as Title VII retaliation claims); *Johnson v. Windstream Communications, Inc*., 545 S.W.3d 234, 241 (Ark. Ct. App. 2018) (applying the burden shifting analysis to retaliation claims under the ADA and ACRA).

Defendants argue that "[t]here is no evidence that UPRR retaliated against Edwards for his report of a confederate flag insignia on a license plate." (Dkt. No. 34, at 9). Mr. Edwards argues that "[t]he discretionary nature of the action, the policy violation, the reasonable inference that UPRR knew about [Mr. Edwards'] contact with Murphy, Whatley's office, and Ms. Owens, and the fact that [Mr.] Edwards had engaged in the same conduct before he . . . complained, yet was not terminated[,] show that his Complaint was a determining factor in his termination." (Dkt. No. 59, at 2). Defendants assert that Mr. Edwards was terminated because he was absent without leave under the collective-bargaining agreement (Dkt. No. 33-4, at 3).

To assess whether there is a causal relationship between Mr. Edwards' termination and his protected activity, the Court must inquire about why Mr. Edwards was terminated. As discussed in the preceding section, to assess why Mr. Edwards was terminated necessarily entails an investigation into the substance and meaning of the collective-bargaining agreement's absent without leave policy. Even if it was not necessary at the *prima facie* stage to determine why Mr. Edwards was terminated, such an analysis would be necessary at the second and third stages of the analysis.

At the second stage, the burden shifts to Mr. Whatley and Union Pacific to articulate a legitimate, non-retaliatory reason for Mr. Edwards' termination. As already discussed, defendants

assert that Mr. Edwards was terminated because he was absent without leave under the collective-bargaining agreement. To determine whether this proffered reason is legitimate and nonretaliatory requires the Court to determine whether Mr. Edwards was absent without leave under the terms of the collective-bargaining agreement. While the Court would have to resolve factual issues to answer this question, such as when Mr. Edwards contacted Union Pacific supervisors and the content of their conversations, the Court would also have to interpret the collective-bargaining agreement to determine whether such contacts meant that Mr. Edwards was absent without leave.

At the third stage, Mr. Edwards must prove that his termination was causally linked to the protected conduct. Based on this Court's review of the applicable law, but-for causation applies to retaliation claims under the ACRA and § 1981. *See Wright*, 730 F.3d at 737 (determining that under Title VII and § 1981, to establish causation, plaintiff must prove the desire to retaliate was the but-for cause of her termination); *Johnson*, 545 S.W.3d at 241 (applying but-for causation to plaintiff's retaliation claims under the ADA and ACRA); *see also Burkhart v. Am. Railcar Indus., Inc.*, 603 F.3d 472, 477 (8th Cir. 2010) ("We analyze Burkhart's Title VII and ACRA retaliation claims in the same manner.") (citation omitted); *Killingsworth v. Union Pacific R.R. Co.*, No. 4:15-cv-00647-SWW, 2016 WL 5842875 (E.D. Ark. Oct. 4, 2016) (stating that "[r]etaliation claims under 42 U.S.C. § 1981, Title VII and ACRA are evaluated under the same standards"). On the record evidence before the Court, a but-for causation determination necessarily implicates the same factual issues regarding Mr. Edwards' alleged contacts with Union Pacific supervisors and an interpretation of the collective-bargaining agreement.

Based upon the foregoing discussion and viewing the record evidence in the light most favorable to Mr. Edwards, the Court concludes that the success of Mr. Edwards' retaliation claims against Mr. Whatley and Union Pacific are substantially dependent upon an analysis of the

collective-bargaining agreement. The retaliation claims against Mr. Whatley and Union Pacific are therefore "minor" grievances that are completely preempted and precluded by the RLA. Accordingly, the Court concludes that Mr. Edwards' retaliation claims against Mr. Whatley and Union Pacific are subject to mandatory binding arbitration under the RLA. The Court dismisses with prejudice Mr. Edwards' retaliation claims against Mr. Whatley and Union Pacific.

## V. Motion To Certify

With his response to the pending motion for summary judgment, Mr. Edwards filed a motion to certify seeking an Order from this Court "to remand this matter or certify this matter to the Arkansas Supreme Court." (Dkt. No. 59, at 5). Mr. Edwards contends that "[t]he ACRA has a specific statutory scheme that provides that a defendant avoids liability by showing that his actions were based on legitimate, nondiscriminatory factors and not on unjustified reasons." (*Id.* (citing Ark. Code Ann. § 16-123-103(c)). Mr. Edwards argues that "[i]t is uncertain whether the state court would hold that the ACRA requires a motivating factor or a determining factor," and therefore this Court should refer this question of "unsettled law" to the Arkansas Supreme Court (*Id.*, at 6).

The Court determines the RLA preempts and precludes Mr. Edwards' claims for the reasons explained and, therefore, dismisses with prejudice Mr. Edwards' complaint. For this reason, the Court denies as moot Mr. Edwards' motion to certify (Dkt. No. 59). Even if this Court were to hear Mr. Edwards' claims, for the following reasons, the Court would deny Mr. Edwards' motion to certify this question to the Arkansas Supreme Court.

Controlling law requires this Court to evaluate claims under the ACRA in the same manner as claims under Title VII. *Littleton v. Pilot Travel Ctrs., Inc.*, 568 F.3d 641, 643 (8th Cir. 2009) (citing *Clegg v. Ark. Dept. of Corr.*, 496 F.3d 922, 926 (8th Cir. 2007)) ("We analyze Title VII

and ACRA claims in the same manner.").  In recent Arkansas appellate decisions, the appellate courts concluded that the burden-shifting analysis set forth in *McDonnell Douglas* applies to ACRA claims.  *Johnson*, 545 S.W.3d at 241; *Alexander*, 505 S.W.3d at 245 ("Our supreme court has adopted the three-stage, burden-shifting standard set forth in [*McDonnell Douglas*] . . . .") (citations omitted).  Further, an Arkansas appellate panel recently rejected the contention Mr. Edwards purports to advocate here that, under the ACRA, the "honest belief" rule is an affirmative defense.  *See Brown v. United Parcel Service, Inc.*, 531 S.W.3d 427, 438 (Ark. Ct. App. 2017). Moreover, based on its analysis of Mr. Edwards' ACRA discrimination and retaliation claims, the Court determines that in this case the issue of whether the "honest belief" rule is an affirmative defense is irrelevant to the outcome of this dispute.

## VI.    Motion For Summary Judgment

Defendants move for summary judgment on Mr. Edwards' claims of racial discrimination and retaliation under the ACRA.  For the reasons discussed in this Order, the Court determines that the RLA preempts and precludes these claims and dismisses with prejudice Mr. Edwards' complaint.  Therefore, the Court denies as moot defendants' motion for summary judgment (Dkt. No. 33).  Even if this Court were to consider Mr. Edwards' claims, the Court would not permit him to relitigate issues already decided by the NRAB, and therefore, would grant defendants' motion for summary judgment.

### A.    Standard of Review

Summary judgment is proper if there is no genuine issue of material fact for trial. *UnitedHealth Group Incorporated v. Executive Risk Specialty Ins. Co.*, 870 F.3d 856, 861 (8th Cir. 2017) (citing Fed. R. Civ. P. 56).  Summary judgment is proper if the evidence, when viewed in the light most favorable to the nonmoving party, shows that there is no genuine issue of material

fact and that the defendant is entitled to entry of judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Johnson Regional Medical Ctr. v. Halterman*, 867 F.3d 1013, 1016 (8th Cir. 2017) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). A factual dispute is genuine if the evidence could cause a reasonable jury to return a verdict for either party. *Miner v. Local 373*, 513 F.3d 854, 860 (8th Cir. 2008). "The mere existence of a factual dispute is insufficient alone to bar summary judgment; rather, the dispute must be outcome determinative under the prevailing law." *Holloway v. Pigman*, 884 F.2d 365, 366 (8th Cir. 1989).

However, parties opposing a summary judgment motion may not rest merely upon the allegations in their pleadings. *Buford v. Tremayne*, 747 F.2d 445, 447 (8th Cir. 1984). The initial burden is on the moving party to demonstrate the absence of a genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 323. The burden then shifts to the nonmoving party to establish that there is a genuine issue to be determined at trial. *Prudential Ins. Co. v. Hinkel*, 121 F.3d 364, 366 (8th Cir. 2008). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

### B.     Racial Discrimination Claims Against Individuals Under The ACRA

Defendants contend that Mr. Edwards' claims under the ACRA against separate defendant Mr. Whatley should be dismissed because Mr. Whatley is not an "employer" as defined by the ACRA. *See* Ark. Code Ann. § 16-123-102(5) ("'Employer' means a person who employs nine (9) or more employees in the State of Arkansas in each of twenty (20) or more calendar weeks in the current or preceding calendar year"). The Court agrees, in part, and disagrees, in part, with defendants' argument. Courts in this district have consistently found that supervisors do not meet

the definition of "employer" as that term is defined by the ACRA. *Mullen v. Ark. Game and Fish Comm'n*, No. 4:17-cv-00416-SWW, 2017 WL 5162810, at *2 (E.D. Ark. Nov. 7, 2017) (finding that supervisor sued in his individual capacity did not meet the definition of an "employer"); *Richardson v. City of Pine Bluff, AR*, No. 5:05-cv-00179-SWW, 2006 WL 3388341, at *1 (E.D. Ark. Nov. 21, 2006) (dismissing claim against individual supervisor under the ACRA on the grounds that he did not qualify as an "employer"). The Arkansas Supreme Court has held, however, that while the ACRA does not allow individual liability for claims of employment discrimination under Arkansas Code Annotated § 16-123-107(c)(1)(A), individuals may be liable for acts of retaliation under Arkansas Code Annotated § 16-123-108(a). *Calaway Practice Mgmt. Servs. Inc.*, 2010 Ark. 432, at *4, 2010 WL 4524659, at *2 (Ark. Nov. 11, 2010) (unpublished). Therefore, to the extent that Mr. Whatley is being sued in his individual capacity as a supervisor, even if the Court could consider Mr. Edwards' race discrimination claim, the Court would dismiss Mr. Edwards' race discrimination claim against Mr. Whatley.

### C. Prior Determination By The National Railroad Adjustment Board

Based on the parties' summary judgment filings, it is undisputed that, in a letter dated August 2, 2011, sent by Mr. Whatley to Mr. Edwards, Mr. Whatley informed Mr. Edwards that "[o]ur records indicate that you have not performed service since July 1, 2011, therefore, you are absent without leave." (Dkt. No. 33-1, at 64). Mr. Whatley testified that Mr. Edwards was fired because "[h]e was AWOL, absent without leave, for a period equal to or greater than 30 days." (Dkt. No. 33-4, at 3). He further testified that, to keep from being fired, Mr. Edwards needed to "[w]ork within that 30-day period or have some sort of approved leave." (*Id*.). Mr. Whatley testified that he receives data on employee absences, on a weekly basis, from CMS (*Id*., at 4-5). Mr. Whatley further testified that the "30-day AWOL" policy is spelled out in the collective

bargaining agreement (*Id.*, at 6-7). Mr. Whatley recalled that he was told that Mr. Edwards "had not spoken to his manager during that 30-day [period] . . . ." (*Id.*, at 8). Mr. Whatley further testified that the collective bargaining agreement requires communication with a supervisor or manager and that communication with Ms. Owens would not qualify if an employee was trying to let Union Pacific know that he or she would be absent (*Id.*, at 11-12).

The parties also do not dispute that, on Mr. Edwards' behalf, his union, the Brotherhood of Locomotive Engineers and Trainmen, challenged Union Pacific's decision to terminate Mr. Edwards (Dkt. No. 33-5). On August 1, 2014, the NRAB ruled against Mr. Edwards, finding that Mr. Edwards' union failed to prove that Union Pacific violated the collective bargaining agreement when it terminated Mr. Edwards for being absent without leave for more than 30 consecutive days (*Id.*, at 2).

In its Order inviting further briefing, the Court specifically asked the parties to explain, if Mr. Edwards' remaining claims are not preempted or precluded by the RLA, "then what is the effect, if any, of the NRAB's arbitration decision under the parties' collective bargaining agreement (Dkt. No. 33-5, at 1-3) upon Mr. Edwards' remaining ACRA claims?" (Dkt. No. 63, at 2). Mr. Edwards did not address this issue in his filings. Defendants argue that, if Mr. Edwards' claims are not preempted or precluded by the RLA, at a minimum, "general concepts of estoppel prevent him from relitigating material factual issues underlying those claims." (Dkt. No. 67, at 4).

When state law applies to a claim, the Eighth Circuit has stated that courts should look to state law in determining whether to apply issue preclusion. *See Liberty Mut. Ins. Co. v. FAG Bearings Corp.*, 335 F.3d 752, 758 (8th Cir. 2003). However, when federal question jurisdiction applies, the Eighth Circuit has declared that a federal court should apply federal law to determine

the preclusive effect of a prior judgment. *See Jaramillo v. Burkhart*, 999 F.2d 1241, 1245 (8th

Cir. 1993). This Court determines that the result is the same under either Arkansas or federal law.

The Arkansas Supreme Court has explained:

*Res judicata* bars relitigation of a claim in a subsequent suit when five factors are present. These include: (1) the first suit resulted in a final judgment on the merits; (2) the first suit was based upon proper jurisdiction; (3) the first suit was fully contested in good faith; (4) both suits involve the same claim or cause of action; and (5) both suits involve the same parties or their privies. *Moon v. Marquez*, 338 Ark. 636, 999 S.W.2d 678 (1999). Furthermore, *res judicata* bars not only the relitigation of claims that were actually litigated in the first suit, but also those that could have been litigated. *Id.* The purpose of *res judicata* is to put an end to litigation by preventing a party who had one fair trial on a matter from relitigating the matter a second time. *Id.*

. . .

Collateral estoppel requires four elements before a determination is conclusive in a subsequent proceeding: (1) the issue sought to be precluded must be the same as that involved in the prior litigation; (2) that issue must have been actually litigated; (3) the issue must have been determined by a valid and final judgment; and (4) the determination must have been essential to the judgment. *State Office of Child Support Enforcement v. Willis*, 347 Ark. 6, 59 S.W.3d 438 (2001). The party against whom collateral estoppel is asserted must have been a party to the earlier action and must have had a full and fair opportunity to litigate the issue in that first proceeding. *See id.* Unlike *res judicata*, which acts to bar issues that merely could have been litigated in the first action, collateral estoppel requires actual litigation in the first instance. *Id.*

*Powell v. Lane*, 289 S.W.3d 440, 444 (2008).

Federal law is comparable. Under federal law, the doctrine of issue preclusion provides

that once a court has decided an issue of fact or law necessary to its judgment, that decision may

preclude relitigation of the issue in subsequent suits based on a different cause of action involving

a party to the prior litigation. *Plough v. West Des Moines Community Sch. Dist.*, 70 F.3d 512, 514

(8th Cir. 1995) (citing *Allen v. McCurry*, 449 U.S. 90, 94 (1980)); *see United States v. Gurley*, 43

F.3d 1188, 1198 (8th Cir. 1994) (quoting *Montana v. United States*, 440 U.S. 147, 153 (1979)).

There are four prerequisites for issue preclusion under federal law: (1) the issue is identical to one

in a prior adjudication; (2) there was a final judgment on the merits; (3) the estopped party was a party or in privity with a party to the prior adjudication; and (4) the estopped party was given a full and fair opportunity to be heard on the adjudicated issue. *Arkla Exploration Co. v. Texas Oil & Gas Corp.*, 734 F.2d 347, 356 (8th Cir. 1984) (quoting *Oldham v. Pritchett*, 599 F.2d 274, 279 (8th Cir. 1979)).

Based upon these doctrines, regardless if the Court were to look to Arkansas or federal law, the Court would give preclusive effect to the decision by the NRAB that Mr. Edwards, through his union representative, failed to prove that Union Pacific violated the collective bargaining agreement when it terminated Mr. Edwards for being absent without leave for more than 30 consecutive days. *See* 45 U.S.C. § 153(m) ("The [Adjustment Board's] awards shall be final and binding upon both parties to the dispute."); *Andrews v. Louisville & N.R. Co.*, 406 U.S. 320, 325 (1972) ("A party who has litigated an issue before the Adjustment Board on the merits may not relitigate that issue in an independent judicial proceeding. He is limited to the judicial review of the Board's proceedings that the Act itself provides . . . ." (internal citation omitted)); *Summerville v. Trans World Airlines, Inc.*, 219 F.3d 855, 858 (8th Cir. 2000) ("We defer to the System Board's fact-finding because the System Board has exclusive statutory authority to decide disputes . . . regarding the interpretation and application of the collective bargaining agreement."); *see also Collins v. New York City Transit Authority*, 305 F.3d 113, 119 (2d Cir. 2002) (finding that, following a "decision by an independent tribunal," to survive summary judgment a plaintiff "must present strong evidence that the decision was wrong as a matter of fact—e.g. new evidence not before the tribunal—or that the impartiality of the proceeding was somehow compromised."). The NRAB's decision considered the record and noted that "[t]here is a safe harbor that does apply to employees if they substantiate that they are not able to work because of illness or injury" but

concluded that Mr. Edwards "did not fulfill the requirements to obtain that safe harbor . . . ." (Dkt. No. 33-5, at 3). The traditional elements of issue preclusion are present because the fact issues here are identical to the ones considered by the NRAB; the fact issues here were litigated before the NRAB; resolution of the fact issues here was necessary to the judgment of the NRAB, and the NRAB's decision was a valid, final judgment. Thus, the NRAB's findings preclude Mr. Edwards from arguing that Union Pacific violated the collective bargaining agreement when it terminated Mr. Edwards for being absent without leave for more than 30 consecutive days.

As a result, if the Court were to consider the motion for summary judgment filed by defendants, the Court would conclude that, based on the NRAB's determination, Mr. Edwards is unable to demonstrate that he was meeting his employer's legitimate expectations at the time of his termination, thereby precluding him from establishing a *prima facie* case of discrimination and entitling defendants to summary judgment on this claim. Further, the Court would conclude that, based on the NRAB's determination, Mr. Edwards is unable to demonstrate that his termination was sufficiently causally linked to the alleged protected conduct to survive summary judgment on his retaliation claim. If this Court were to give preclusive effect to the NRAB's determination, the Court would conclude that the determination prevents Mr. Edwards from establishing pretext and the but-for causation necessary for his retaliation claim. For these reasons, even if the Court were to consider Mr. Edwards' claims, the Court would grant summary judgment in favor of defendants.

## VII. Conclusion

For these reasons, the Court determines that the RLA preempts and precludes Mr. Edwards' claims and, therefore, dismisses with prejudice Mr. Edwards' complaint. The Court denies as moot Mr. Edwards' motions for leave to file an amended complaint (Dkt. Nos. 64, 66). The Court

denies as moot defendants' motion for summary judgment and denies as moot Mr. Edwards'
motion to certify (Dkt. Nos. 33, 59).

So ordered this the 4th day of March, 2019.

_____
Kristine G. Baker
United States District Judge